**Christopher J. Kayser,** OSB #984244
cjkaser@larkinsvacura.com
**Danielle J. Hunsaker** OSB #045365
dhunsaker@larkinsvacura.com
**Larkins Vacura LLP**
621 SW Morrison St., Suite 1450
Portland, Oregon 97205
Telephone:  503-222-4424
Facsimile:  503-827-7600
Attorneys for U.S. Bank National Association

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

**LAWRENCE JAMES SACCATO,**

                Plaintiff Pro Se,                 Case No. 6:10-cv-06244-AA

    v.

**U.S. BANK NATIONAL ASSOCIATION**       DECLARATION OF CHRISTOPHER J.
**N.D., et al.**       Defendants.       KAYSER IN SUPPORT OF DEFENDANT
                                   U.S. BANK'S MOTION FOR SUMMARY
                                            JUDGMENT

---

      I, Christopher J. Kayser, do hereby attest:

      1.     I make this Declaration in support of U.S. Bank National Association's ("U.S. Bank") Motion for Summary Judgment.

      2.     Attached as Exhibit 1 are true and correct copies of correspondence from plaintiff Lawrence J. Saccato to defendant U.S. Bank and the credit reporting agencies.

      3.     Attached as Exhibit 2 is a true and correct copy of excerpts of the Deposition of Lawrence J. Saccato taken on July 26, 2011.

4.     Attached as Exhibit 3 is a true and correct copy of electronic correspondence between plaintiff Lawrence J. Saccato and defendant U.S. Bank's counsel.

The foregoing statements are made under penalty of perjury on this 7th day of November, 2011, at Portland, Oregon.

/s/ Christopher J. Kayser
Christopher J. Kayser

DECLARATION OF CHRISTOPHER J. KAYSER IN                                Page 2
SUPPORT OF DEFENDANT U.S. BANK'S MOTION FOR
SUMMARY JUDGMENT

USPS First Class Mail

June 15, 2009

Lawrence James Saccato
P.O. Box 143
Glide Oregon 97443

Equifax
P.O. Box 740241
Atlanta, GA 30374

Social # ███████████

Dear Sirs:

This is a letter of dispute.

I recently pulled my credit report and found that US Bank is reporting derogatory information in my account.

I do not recall ever having this account and dispute this.

Signed

*Lawrence Saccato*

Lawrence Saccato

LJS00006

Kayser Declaration Exhibit 1
Page 1 of 8

USPS First Class Mail

June 15, 2009

Lawrence James Saccato
P.O. Box 143
Glide Oregon 97443

TransUnion Consumer Solutions
P.O. Box 2000
Chester, PA 19022-2000

Social ██████████

Dear Sirs:

This is a letter of dispute.

I recently pulled my credit report and found that US Bank is reporting derogatory information in my account.

I do not recall ever having this account and dispute this.

Signed

*Lawrence Saccato*

Lawrence Saccato

USPS First Class Mail

June 15, 2009

Lawrence James Saccato
P.O. Box 143
Glide Oregon 97443

Experian
P.O. Box 9701
Allen, Texas 75013

Social #▇▇▇▇▇▇

Dear Sirs:

This is a letter of dispute.

I recently pulled my credit report and found US Bank  reporting derogatory information in my account.

I do not recall ever having this account and dispute this.

Signed

*Lawrence Saccato*

Lawrence Saccato

LJS 00004

Kayser Declaration Exhibit 1
Page 3 of 8

June 22, 2009

Lawrence James Saccato
1224 NE Walnut #257
Roseburg Oregon 97470
541-672-9590

US Bank
P.O. Box 108,
Saint Louis, MO 63166

Social ███████████

Two whom it may concern,

This is a letter of dispute.

I recently pulled my credit report and found the US Bank reporting derogatory information in my
account.

I do not recall ever having this account and dispute this.

Sincerely,

*Lawrence Saccato*

Lawrence Saccato

LJS 00008

Kayser Declaration Exhibit 1
Page 4 of 8

USPS certified Mail # 70072680000255257279

April 15, 2010

Lawrence James Saccato
P.O. Box 143
Glide Oregon 97443

Equifax
P.O. Box 740241
Atlanta, GA 30374

Social # ████████████

Dear Sirs:

This is a letter of dispute.

I recently pulled my credit report and found that US Bank is reporting derogatory information in my account.

I do not recall ever having this account and dispute this.

Signed

*Lawrence Saccato*

Lawrence Saccato

USPS Certified Mail #70072680000255258009

Lawrence Saccato
P.O. Box 143
Glide Oregon 97443


Social ████████

US Bank
P.O. Box 108
Saint Louis, MO 63166


Sirs:


This is a letter of dispute.

I recently pulled my credit report and found that US Bank is reporting derogatory information in my account.

I do not recall ever having this account and dispute this.


Sincerely

*Lawrence Saccato*

Larry Saccato

USPS certified Mail # 70072680000255257286

April 15, 2010

Lawrence James Saccato
P.O. Box 143
Glide Oregon 97443

TransUnion Consumer Solutions
P.O. Box 2000
Chester, PA 19022-2000

Social # ██████████

Dear Sirs:

This is a letter of dispute.

I recently pulled my credit report and found that US Bank is reporting derogatory information in my account.

I do not recall ever having this account and dispute this.

Signed

*LAWRENCE SACCATO*

Lawrence Saccato

USPS certified Mail # 70072680000255257262

April 15, 2010

Lawrence James Saccato
P.O. Box 143
Glide Oregon 97443

Experian
P.O. Box 9701
Allen, Texas 75013

Social # ▮▮▮▮▮▮▮

Dear Sirs:

This is a letter of dispute.

I recently pulled my credit report and found US Bank reporting derogatory information in my account.

I do not recall ever having this account and dispute this.

Signed

*Lawrence Saccato*

Lawrence Saccato

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


LAWRENCE JAMES SACCATO,          )

                Plaintiff Pro Se,)

    v.                          )No. 6:10-cv-06244-AA

DAVIS LAW FIRM,                  )

              Defendant,        )

U.S. BANK NATIONAL ASSOCIATION,)

N.D.,                            )

            Co-Defendant.    )


DEPOSITION OF LAWRENCE JAMES SACCATO

July 26th, 2011

Tuesday

10:00 A.M.


THE DEPOSITION OF LAWRENCE JAMES SACCATO

was taken at CC Court Reporting & Videoconferencing,

172 East 8th Avenue, Eugene, Oregon, before Eleanor

G. Knapp, CSR-RPR, Certified Shorthand Reporter in

and for the State of Oregon.

**18**

1  up here. And then my dad bought my half out, and
2  him and Doug owned it for quite some time.
3     Q.  Is your dad still alive?
4     A.  No.
5     Q.  What was his name?
6     A.  Mario.
7     Q.  Saccato?
8     A.  Yeah. And Doug passed away -- John D.
9  Dillingham passed away, God, almost three years now.
10     Q.  Getting through here. Trinity Holdings?
11     A.  Same.
12        Basically what that was, they were land
13  trusts, strictly a land trust to hold, say, two to
14  three lots. And as the lots divested, were sold,
15  then they weren't in existence. The paperwork
16  exists, but they don't own anything.
17     Q.  What happened to the money from the sale
18  of the lots?
19     A.  Rolled it into build another home.
20     Q.  And I haven't -- I guess I haven't asked
21  for each of these trusts, but I assume the answer is
22  the same on the beneficiaries, you are not going to
23  reveal who those are?
24     A.  At this point I won't. I don't think it's
25  really relevant to what we were here for.

**19**

1        What we are here for is what your client
2  did and didn't do when they were challenged. As we
3  get into it -- I'll do it one time. I'll object for
4  those same reasons. But I don't want to waste a
5  bunch of time on every one.
6        I'll answer your questions, but I'll --
7     Q.  Yeah. And I don't want to waste a bunch
8  of time either. That's why I want to do it kind of
9  en masse rather than going through it.
10     A.  No problem. But if you continue to ask
11  stuff that has no relevance to what we are here for,
12  then I'll object. But one time I'll object saying
13  everything because I don't want to waste your time,
14  her time, my time.
15     Q.  Sure. Yeah, yeah. This is just
16  background --
17     A.  I understand --
18        THE REPORTER: Excuse me.
19        (A discussion was had off the record.)
20  BY MR. KAYSER:
21     Q.  So again, the beneficiaries of that you
22  are not going to disclose?
23     A.  No.
24     Q.  How about Rosco Holdings?
25     A.  Same. This was all like maybe ten years

**20**

1  ago. And it was a 21-lot subdivision that was
2  developed and the lots were all sold off.
3     Q.  And you were a trustee of that as well?
4     A.  Yes.
5     Q.  Okay. Let's talk now, have you had any
6  accounts with U.S. Bank?
7     A.  I may have. I can't admit or deny.
8  That's what started this. I was disputing them,
9  trying to figure out if there were accounts, because
10  I very well may have.
11     Q.  But you are not sure?
12     A.  No. When all the banks were doing their
13  flip-flops, that's what initially started the
14  disputing of the accounts, to find out which
15  accounts were which and who had them, because I'm
16  not sure if U.S. Bank absorbed a couple of banks and
17  then credit lines or the trade lines ended up with
18  them or not. And that's what started the disputing,
19  which was the proper way to find out whether the
20  account was -- but I very well could have.
21     Q.  Is it fair to say that the dispute over
22  your accounts goes back to about 2009?
23     A.  Yes. End of 2009. Somewhere in there.
24     Q.  From 2009 forward can you identify all the
25  credit cards that you held that you can think of

**21**

1  sitting here today?
2     A.  You mean with U.S. Bank?
3     Q.  With anyone.
4     A.  You could look at it on the credit report
5  that you guys pulled.
6     Q.  I'm just asking you. Sitting here today,
7  what do you know?
8     A.  I had multiple credit cards.
9     Q.  How many?
10     A.  I can't tell you.
11     Q.  How many can you think of right now?
12     A.  Between five and ten.
13     Q.  Which ones? Can you describe which ones
14  they were? VISA, MasterCard, which banks?
15     A.  Yeah, VISA, MasterCard, Discover.
16     Q.  Which banks are you aware that you have
17  those with?
18     A.  Could have been B of A, FNBO, all the ones
19  that you could pull up off Pacer. Let's see who
20  else. Discover.
21        U.S. Bank alleges -- although we've yet to
22  receive a validation for one of the U.S. Bank ones
23  that they've alleged and you've alleged in your
24  responses to the interrogatories -- there's been
25  some accounts.

## 22

1    Q.   Any others?
2    A.   Oh, man. There could have been, but I
3 just don't know.
4    Q.   You can't remember them sitting here
5 today?
6    A.   Yeah. You probably have more information
7 in there in your --
8       (Deposition Exhibit No. 1
9        marked for identification.)
10 BY MR. KAYSER:
11    Q.   All right. What I've marked here in front
12 of you is Deposition Exhibit 1. The Bates number
13 down at the bottom is USB/SACC 000080. It runs
14 through consecutive Bates numbers up to Bates number
15 ending 238.
16    A.   Correct.
17    Q.   And for convenience when we refer to Bates
18 numbers here, I'm just going to refer to the last
19 digits here.
20    A.   That's fine. That's fine.
21    Q.   And this appears to be -- the first page
22 of this appears to be an account statement with U.S.
23 Bank for Emerald Investment Company, Lawrence J.
24 Saccato. Do you see that?
25    A.   It appears to be that, yes.

## 23

1    Q.   Is this one of the accounts you had with
2 U.S. Bank?
3    A.   It may be.
4    Q.   Now looking at this can you confirm
5 whether it is or not?
6    A.   No. I probably couldn't. I don't see --
7 do you have the original application in here, a wet
8 ink signature of it?
9    Q.   No.
10    A.   Then I probably could not. I can't admit
11 or deny.
12    Q.   Is this PO box -- It looks like down at
13 the bottom PO Box 143, Glide, Oregon. Is that your
14 PO box?
15    A.   No. But I've gotten mail there before.
16    Q.   Whose PO box is that?
17    A.   Valynn Currie.
18    Q.   Do you ever list that as your address?
19    A.   No. Not in the last couple of years.
20 What's the date on this thing? This is 2011? No.
21    Q.   You've never listed that as your address?
22    A.   Not in the last couple of years. Prior to
23 that I may have used that address, yeah.
24    Q.   Then what I'd like you to do is turn now
25 to page 237 of Exhibit 1.

## 24

1    A.   Yes. Would that be the last page?
2    Q.   Second-to-the-last.
3    A.   Yes.
4    Q.   And it lists the address there as 1553
5 Kendall Street?
6    A.   Correct.
7    Q.   Roseburg, Oregon.
8    A.   Correct.
9    Q.   That was your address?
10    A.   Correct.
11    Q.   If this bank statement came to your
12 address, you would have received it?
13    A.   Yes. Could have.
14    Q.   Does that help, looking at that, the fact
15 that this bank statement was addressed to you at
16 your residence, whether or not this is in fact
17 yours?
18    A.   Well, I can't admit or deny. If you show
19 me the original application --
20    Q.   Why do you need the original application
21 as opposed to looking at this?
22    A.   Anybody can print anything up. You must
23 have saw the thing on Ann (sic) Green, didn't you on
24 60 Minutes?
25    Q.   No.

## 25

1    A.   You didn't follow that, the robo signer
2 thing where people have just been making stuff up?
3 You didn't see that? I'll have to shoot it to you.
4    Q.   You can't recall using this account?
5    A.   I may have. I can't admit or deny.
6    Q.   You can't admit or deny whether this is
7 yours?
8    A.   It very well could have been.
9    Q.   All right. What I'd like you to do is
10 turn to page 156 in that exhibit.
11    A.   Yes. Okay.
12    Q.   And this is another account statement for
13 the same account. The account number is listed at
14 the top right-hand corner, if you look. It's
15 483349200097646. Do you see that?
16    A.   Correct. Yes, I see that.
17    Q.   It lists some charges here. Do any of
18 those charges look familiar to you?
19    A.   That's a long time ago, Chris. They may.
20 They may not. Shell Oil. I don't know.
21    Q.   How about Phoenix Hydraulic?
22    A.   Phoenix Hydraulic? Could be.
23      I'd like to make that objection right now
24 to this because this isn't -- this cause of action
25 against your client has nothing to do with the

26

1  alleged account. It has to do with what your client
2  did or did not do when challenged under the Fair
3  Credit Reporting Act. And that's what the causes of
4  action are here.
5      But having said that, I'll go ahead and
6  answer your question.
7      I don't recall. They could have been.
8  They could not have been. I'm not admitting or
9  denying.
10     Q.  Do you have a dentist in Roseburg?
11     A.  Yes. Ashley Dental.
12     Q.  Ashley Dental. And do you have a specific
13 dentist you see there?
14     A.  It's just called Ashley Dental. They
15 clean my teeth.
16     Q.  Do you know Mark Driver?
17     A.  Yes. I know of him.
18     Q.  Who is Mark Driver?
19     A.  He is a dentist in town.
20     Q.  Have you ever seen him for dental work?
21     A.  In the past.
22     Q.  I'd like you to turn to page 170 of
23 Exhibit 1, then.
24     A.  Yes.
25     Q.  And this again is another account

27

1  statement. This one is a March statement for
2  activity from February 27, 2008, through March 27,
3  2008.
4      A.  Yes.
5      Q.  Again, for the account number ending in
6  -7946. It lists a series of charges there, one of
7  which is to Mark Driver. And you have seen him for
8  dental work in the past?
9      A.  I have before in the past. His parents
10 used to live next door on Kendall Street.
11     Q.  If we were to subpoena Mark Driver's
12 records to see if he treated you for $103, would
13 that satisfy you that this is your account?
14     A.  It possibly could -- not that it's my
15 account, but that there was a charge made to that
16 account. And once again I would like to object to
17 the relevance, how these questions, this line of
18 questioning pertains to the case that your client
19 has against it -- the causes of action your clients
20 have against it right now.
21     Q.  Let me ask you this: If we were able to
22 prove that the accounts on your credit report were
23 in fact yours, would that make a difference?
24     A.  No. They have never been validated. How
25 are you going to prove it if you won't provide the

28

1  wet ink signature, like I requested, of the
2  application?
3      Q.  I'm going to prove it by -- if I have to
4  I'm going to subpoena people like Mike Driver and
5  confirm charges were made in your name.
6      A.  But that's still irrelevant when it comes
7  to the causes of action against your client. It
8  does not matter whether there was zero or there was
9  a hundred thousand dollars. Neither -- any amount
10 does not give rise to relieve your client of its
11 responsibilities under the Fair Credit Reporting
12 Act. And that's what this case is about.
13     Whether you can say yes, this is your
14 account and you owed a dollar or you owed a hundred
15 thousand dollars -- it doesn't mention money
16 anywhere in the Fair Credit Reporting Act. And
17 that's what we are in this case regarding is what
18 your clients did or did not do or failed to do when
19 challenged under the FCRA. That's what the basis of
20 this case is.
21     You know, you can do all you want and say
22 it should have been $500 or a thousand dollars.
23 It's irrelevant to the causes of action against your
24 client.
25     Q.  It's your position that you had a dispute

29

1  about those accounts showing up on your credit
2  report?
3      A.  Yes.
4      Q.  Those disputes should have been --
5      A.  Marked in dispute.
6      Q.  -- marked in dispute?
7      A.  Part of it. And they should have been
8  reported correctly. And when it was -- when the
9  dispute came back, they should have done a
10 reinvestigation into the matter, which they did not
11 do -- or your records don't indicate yet that they
12 have done the reinvestigation. I'm sorry.
13     Q.  It's irrelevant, according to you, whether
14 or not you actually owned these accounts with
15 respect to that dispute because there was a dispute?
16     A.  In the action against your clients, it's
17 irrelevant whether there was one or five accounts or
18 whatever. It's -- They failed to do the
19 investigation. They failed to mark the account in
20 dispute. They reported erroneous, inaccurate
21 information, and they don't have the systems in
22 place to prevent errors.
23     Q.  Let me ask you this. We may be able to
24 speed this deposition along. If I understand
25 correctly --

30

1    A.   Go ahead.
2    Q.   Let's assume we are able to go through and
3    prove that all the accounts that were showing up on
4    your credit report were in fact yours.  You
5    understand that?
6    A.   Yes.
7    Q.   Is it your position that that doesn't
8    really matter because you identified a dispute as to
9    whether or not those were yours and as a result the
10   bank had certain obligations?
11   A.   Correct.  Correct.  And the obligations --
12   I didn't create the obligations.  The Fair Trade
13   Commission and the legislature created the
14   obligations for your bank -- I'm sorry; not your
15   bank -- for your clients to operate.
16        And consumers have some rights in that.
17   And in those consumer rights, one of them is to
18   dispute the account.  And your client has to take
19   certain procedures, which they did not do in this
20   particular case -- or actually maybe more than one
21   case.
22   Q.   We may have a difference of opinion on
23   that.
24   A.   We will, I'm sure.
25   Q.   So let's go through the deposition.  I'll

31

1    ask you some questions.  I think that's going to
2    help really speed things up.
3    A.   I'm not trying to make this difficult.
4    I'm just trying to keep the focus on what my causes
5    of action are against your client.
6         I have to grant you leeway, and I will.
7    But I can object, and then about -- but I don't want
8    to have to go through the whole objection every time
9    because we'll be here for hours.  I'll object.  You
10   ask the questions.  I'll tell you to the best of my
11   ability.
12        But I would like to keep the focus of this
13   on the causes of action against your client as
14   opposed to -- because it's irrelevant even if I did
15   say it was mine.  And it doesn't matter if there was
16   zero or a hundred thousand dollars; it's irrelevant
17   to what we are here -- our dispute is.
18   Q.   I understand your position on that.
19        With respect to this first account, you
20   cannot deny, sitting here today, that this is in
21   fact yours?
22   A.   No.  I cannot admit nor deny.  If you
23   prove -- I had requested the original wet ink
24   signature of the application, and you guys have not
25   supplied it yet for one reason or another.

32

1    Q.   Now I want you to turn to page 235 here.
2    Again, this is another account statement for June 2,
3    2004.  It leaves -- it has a payment here for
4    $10,000 for Gleaves Swearingen, et al, Eugene.
5    A.   Yeah.
6    Q.   Those were your attorneys.  Right?
7    A.   Could have -- Yes.
8    Q.   Was it Patrick or Fritz --
9    A.   Fritz Batson.
10   Q.   This is the law firm he works at?
11   A.   Yeah.  You could subpoena him.
12   Q.   If we were able to subpoena Fritz --
13   A.   Just call him up and ask him.
14   Q.   Ask him if this was -- this charge was
15   made on this account and who it was made by?
16   A.   Yeah.  You can do that.
17   Q.   If we are able to do that, would that
18   satisfy you that this is, in fact, your account?
19   A.   No.
20   Q.   Because the only thing that will satisfy
21   you is the original account agreement?
22   A.   The account -- there is no existence of an
23   account unless you have the original application for
24   the account.
25   Q.   Even if you were charging on it?

33

1    A.   Where's the original application?
2    Q.   You can't remember, sitting here today,
3    charging $10,000?
4    A.   How long ago was that?
5    Q.   That was in 2004.
6    A.   Where were you at 2004?
7    Q.   I'm asking you.  You can't remember that?
8    A.   I can't.  But it very well could have been
9    a charge made on that.
10   Q.   You do remember these guys representing
11   you?
12   A.   Yes.  I already spoke to you.  I did a
13   deposition with them before.
14        And again, I'll object because it has no
15   relevance to what the causes of action against your
16   client are.
17   Q.   Because, again, whether these accounts are
18   yours or not in your mind is irrelevant to this
19   case?
20   A.   It's irrelevant.  Are you aware of any
21   spot within the Fair Credit Reporting Act that
22   mentions money -- or amount of money, Chris?  I know
23   you are asking the questions.
24        Should we go off record for a sec?
25   Q.   No.  That's all right.  Let me focus here.

Kayser Declaration Exhibit 2
Page 5 of 11

34

1    There's something I'm looking for.
2        A.    That's all right.  Take your time.
3        Q.    Have you ever taken a trip to Mexico with
4    Valynn Currie?
5        A.    Yes.
6        Q.    And if you charged that on one of your
7    credit card accounts, wouldn't that show that that
8    account was, in fact, yours?
9        A.    No.  But it would show that the charge was
10    made.
11        Q.    Who would the charge have been made by?
12        A.    Anybody that had that trade line or credit
13    card in that trade line.  You would have to look at
14    -- we would have to look at the signature.  If you
15    provide the signature, then maybe we could tell a
16    little better.
17            Even if -- even if it was done, how does
18    that alleviate your client from its responsibilities
19    under the Fair Credit Reporting Act?
20        Q.    Let me ask you this:  If you've got an
21    account that you know is yours with a bank and you
22    report to the bank that you think that it's not
23    yours, knowing that it is, does the bank have any
24    duties at that point?
25        A.    Yes.

35

1        Q.    What does the bank have to do?
2        A.    The bank has a duty to validate the debt.
3    It's -- I didn't write the laws.  Congress
4    wrote the laws.
5        Q.    In terms of credit reporting, though, if
6    you tell the bank this account that I know is mine
7    -- if you tell the bank, "I don't know that this
8    account is mine.  I want it taken off my credit
9    report," does the bank have a duty to investigate?
10        A.    I don't believe I asked to have it taken
11    off the credit report.  I asked them -- I disputed
12    it.  I disputed it.  Once you dispute it, that
13    triggers their responsibilities under the Fair
14    Credit Reporting Act to do an investigation, to mark
15    the account in dispute while it's doing an
16    investigation, and to report the findings to the
17    credit reporting agencies as well as the consumer.
18        Q.    Even if you know the account is, in fact,
19    yours?
20        A.    The dispute was sent to the bank.  The
21    dispute was sent to the reporting agencies.  There's
22    a required investigation.  If there's a disputed
23    amount, they are still required to do it.
24        Q.    Does there need to be any legitimacy to
25    the dispute?

36

1        A.    Of course there has to be legitimacy to
2    the dispute.  And if there's incorrect reporting or
3    incorrect amounts being reported, that's legitimate,
4    even if the account was owned or not owned.
5            And now it's happened multiple, multiple,
6    multiple occasions where one bank swallows up
7    another bank and all of a sudden now their label --
8    U.S. Bank, FNBO, or whomever -- is on an account,
9    and you have a right to know that the accounting was
10    done properly in that transfer.
11        Q.    Could you turn to page 208 of Exhibit 1?
12        A.    Yes.
13        Q.    This is a January statement for --
14        A.    I'm not there yet.  Hang on.
15        Q.    This is a January statement for the period
16    December 23, 2005, through January 25, 2006 --
17        A.    Correct.
18        Q.    -- again for account number ending in
19    00097646.  And if you look down in the middle of the
20    page, it lists two charges.
21        A.    Yes.
22        Q.    One, it looks like, for U.S. Air ticket
23    for Valynn Currie, and one is a U.S. Air ticket, it
24    appears, for you.
25        A.    It appears that way, yes.

37

1        Q.    Did you make those charges?
2        A.    I couldn't tell you for sure.  I could
3    have.
4        Q.    If you didn't, who would have?
5        A.    Maybe Ms. Currie.
6        Q.    She might have used this credit card?
7        A.    She may have.  I can't recall back.  When
8    was this?  2006?  I mean, that's five years ago.  I
9    just don't recall.
10        Q.    Did you take a trip to Mexico?
11        A.    Very well could have been.  I would have
12    to go back and look at my pictures.  But I feel like
13    we could have.
14        Q.    Do you have a personal relationship with
15    Ms. Currie?
16        A.    She's a real estate broker.  She's been
17    friends.  And I help her once in a while, do some
18    excavation at her place.
19        Q.    But you also took a vacation together?
20        A.    We could have went to the same resort.  We
21    could have.
22            Once again, I'm going to object.  You want
23    me to say the whole objection?  You know my
24    objection.  Right?
25        Q.    You can do whatever you want.  I just want

38

1  you to answer the question.
2      A.  I answered it to the best of my ability.
3      Q.  Then I would like you to turn --
4          (Deposition Exhibit No. 2
5          marked for identification.)
6  BY MR. KAYSER:
7      Q.  This is a series of checks beginning with
8  Bates number, 38 going through Bates number 54.
9      A.  Oh, I see.  Over here.
10     Q.  I just have a few questions --
11     A.  Okay.
12     Q.  -- with you on these checks.  First, it
13  looks like if we look at the first page this looks
14  like a check for $750.  Do you see that?
15     A.  Yes.
16     Q.  And it's to make a payment on account
17  number 7646.  Do you see that?
18     A.  Yes.  Ending 7646, yes.
19     Q.  And the check has a signature there, and
20  it's written out of the L. Saccato Investments.
21     A.  Yes.
22     Q.  What is L. Saccato Investments?
23     A.  It's just a credit line with Wells Fargo.
24     Q.  So you were writing this check out of a
25  credit line?

39

1      A.  Yes.
2      Q.  Is that your signature on the check?
3      A.  It would appear to be.  I couldn't know
4  unless I saw the original.  I'd have to refer back
5  to the Ann Green -- you really haven't seen that?
6      Q.  Yeah.  But that appears to be your
7  signature?
8      A.  It could be.  But without seeing the
9  original, I can't admit or deny.
10     Q.  If we were able to get the original --
11     A.  If you got the original.
12     Q.  If the original showed you were paying
13  $750 to this account, would that be sufficient to
14  acknowledge that this, in fact, was your account?
15     A.  It may or may not.  If you got me the
16  original, I would be able to tell whether it was --
17  unfortunately, the way that systems have played, you
18  can't tell anymore unless you see original wet ink
19  signature.  They are paying them kids $10 an hour as
20  long as they sign the lady's name 60 times an hour.
21  And they do a pretty good job of signing the lady's
22  name.
23     Q.  Do you maintain records for your bank
24  account?
25     A.  No.

40

1      Q.  What do you do?  Just throw them away?
2      A.  Yeah.  I don't think I've gotten many
3  statements.
4      Q.  Do you maintain statements for tax
5  purposes?
6      A.  I'm not required to.  I've never been
7  notified of a requirement to keep books and records.
8      Q.  Do you file taxes?
9      A.  When I'm required to.  When I have income,
10  I do.
11     Q.  Have you filed in the last five years?
12     A.  No.
13     Q.  Let's go to the next check here.  Again,
14  the same thing, a check for $500 made payable to
15  U.S. Bank on -- it looks like for account ending in
16  7646.  Do you see that?
17     A.  Yes.
18     Q.  This one is written out of the account for
19  Hideaway Self Storage.
20     A.  Yes.
21     Q.  And what's the address listed there?
22     A.  Which address?  265 Grant Smith Road.
23     Q.  What's the 265 Grant Smith Road?
24     A.  Hideaway Self Storage.
25     Q.  That's where it's located?

41

1      A.  Yes.
2      Q.  Isn't that where Ms. Currie has her office
3  as well?
4      A.  She has a building at 265.  The storage
5  facility just rents an office from her, because when
6  the County went through on the breach of contract
7  case -- when they went through, they removed the
8  entrance to the storage facility.  So they had to
9  provide another access into the --
10     Q.  Does the storage facility still exist?
11     A.  Yeah.
12     Q.  It exists -- the actual facility itself is
13  at this address?
14     A.  The office is at 265.
15     Q.  Where is the facility?
16     A.  At 269.
17     Q.  Grant Smith?
18     A.  Yes.
19     Q.  And this was written out of an Umpqua Bank
20  account?
21     A.  Yes.
22     Q.  Does Hideaway Self Storage have an Umpqua
23  Bank account?
24     A.  Yes.
25     Q.  Is this the bank account number on the

| | 74 |
|---|---|
| 1 | Q.    So you are saying between the time you |
| 2 | originally disputed -- |
| 3 | A.    While they are doing their investigation. |
| 4 | Q.    -- up to this date your account needed to |
| 5 | be in dispute. |
| 6 | A.    Yes. |
| 7 | Q.    Do you have credit reports from that time |
| 8 | period that you are going to produce? |
| 9 | A.    I've given you copies of all the credit |
| 10 | reports I have.  But the credit reports should |
| 11 | identify that the account was in dispute during the |
| 12 | reinvestigation. |
| 13 |     This is one account, but there should have |
| 14 | been four more accounts.  How many did you allege? |
| 15 | In the stuff that you produced or maybe in your |
| 16 | answers to the interrogatory, I believe you stated |
| 17 | that there was multiple accounts with U.S. Bank and |
| 18 | that U.S. Bank had sold the one account, that they |
| 19 | had sold that account.  You said that they had |
| 20 | previously sold that account and they weren't |
| 21 | required to mark it or do an investigation. |
| 22 |     I don't have the interrogatories with me, |
| 23 | but you alleged -- or your firm alleged that U.S. |
| 24 | Bank stated there was multiple accounts and the one |
| 25 | account had been sold -- I'm sorry -- all but one |

| | 75 |
|---|---|
| 1 | account had been sold.  I think the only account you |
| 2 | said hadn't been sold -- go ahead if you have to get |
| 3 | that. |
| 4 | Q.    That's all right.  I just have -- |
| 5 | A.    Can we take five minutes? |
| 6 | Q.    You want to take five minutes? |
| 7 | A.    I don't need it. |
| 8 | Q.    I just wanted to check the time to make |
| 9 | sure my meter is not running out. |
| 10 | A.    They already towed it, trust me. |
| 11 |     Go ahead.  I'm sorry.  Anyway, you guys |
| 12 | stated that all the accounts had been sold -- I |
| 13 | believe all the accounts had been sold with the |
| 14 | exception of one account when I was reviewing your |
| 15 | answers to the interrogatories.  But they only -- |
| 16 | they only -- when we disputed, they only |
| 17 | investigated the one account.  They only reported |
| 18 | back on the one account. |
| 19 | Q.    Which accounts did you say were in |
| 20 | dispute? |
| 21 | A.    I disputed all the U.S. Bank accounts. |
| 22 | Q.    So the facts as we know them right now: |
| 23 | You dispute whether the U.S. Bank accounts are yours |
| 24 | at all.  Right? |
| 25 | A.    Correct. |

| | 76 |
|---|---|
| 1 | Q.    At least according -- from this letter, |
| 2 | from what we can see, Equifax does an investigation |
| 3 | of your dispute -- |
| 4 | A.    Yes. |
| 5 | Q.    -- and reports the results of its |
| 6 | investigation on this letter? |
| 7 | A.    Correct. |
| 8 | Q.    Some of which you've redacted. |
| 9 | A.    Well, but -- No.  That would have been the |
| 10 | U.S. Bank. |
| 11 | Q.    We've got to take you for your word on |
| 12 | that. |
| 13 | A.    Yeah, but I can prove it. |
| 14 | Q.    You can prove it by producing the |
| 15 | unredacted copy of it? |
| 16 | A.    You should have a copy of it because your |
| 17 | client pulled it. |
| 18 | Q.    This letter to you? |
| 19 | A.    Yeah.  Your client should have a copy of |
| 20 | my credit report because your client pulled it in |
| 21 | February of '11. |
| 22 | Q.    But this letter is directed to you. |
| 23 | A.    Correct. |
| 24 | Q.    So we don't have a copy of this letter. |
| 25 | A.    I don't know what they send to you guys. |

| | 77 |
|---|---|
| 1 | That's what we have to figure out when we depose |
| 2 | Stephanie. |
| 3 | Q.    But you have a copy of this letter |
| 4 | unredacted. |
| 5 | A.    Yes. |
| 6 | Q.    So this letter, which is Equifax's |
| 7 | reinvestigation, reports the results of their |
| 8 | investigation.  Right? |
| 9 | A.    Yes.  You should pretty much -- now it |
| 10 | comes back.  You should pretty see that this -- |
| 11 | is your client's address Minneapolis, Minnesota? |
| 12 | Q.    And the results of that investigation -- |
| 13 | Equifax stated, concluded that -- Equifax verified |
| 14 | that this item belongs to you, "this item" referring |
| 15 | to the account number 483349200009.  Do you see |
| 16 | that? |
| 17 | A.    Yes.  I did see that. |
| 18 | Q.    Do you have any basis to dispute Equifax's |
| 19 | conclusion here that that account in fact belongs to |
| 20 | you? |
| 21 | A.    Not right this moment I don't. |
| 22 | Q.    Let's go back to -- |
| 23 | A.    Except that -- step back just for a second |
| 24 | because it says current status, charge off, type of |
| 25 | account, revolving.  So if it was charged off, they |

Kayser Declaration Exhibit 2
Page 8 of 11

78

1  don't own the account any longer.
2      Q.   Or they have just written it off as a bad
3  debt.
4      A.   Yes.
5      Q.   But that doesn't necessarily mean you
6  don't still owe the money?
7      A.   Correct.  If indeed they prove that the
8  account was mine and they have done the ledger
9  accounting.
10     Q.   Then getting back to these checks on
11  Exhibit No. --
12     A.   Can I real quick --
13     Q.   You can set Exhibit 6 aside and Exhibit 7
14  aside.
15     A.   I don't want to get them all mixed up.
16  What have we got?  3, 4.
17     Q.   All right.  Let's get you to, within
18  Exhibit 5, Bates number 1066.
19     A.   I'm there.
20     Q.   Bates number 1066 is a check written out
21  of this U.S. Bank account to Chase.  Do you see
22  that?
23     A.   Yes.
24     Q.   Did you have an account with Chase?
25     A.   Yes.

79

1      Q.   Was that a credit card account?
2      A.   Yes.
3      Q.   What's the status of that account?
4      A.   I don't know.
5      Q.   Is it still active?
6      A.   I don't think so.
7      Q.   And then let's go to 1067, a check written
8  to Hideaway Storage?
9      A.   Yes.
10     Q.   And that's the -- it doesn't list it as a
11  trust.  What is Hideaway Storage?
12     A.   Hideaway Storage.
13     Q.   Is that a business name?
14     A.   Yeah.  Hideaway Storage.
15     Q.   It's the business name of the thing that's
16  owned by the trust?
17     A.   Sitting on, yeah, the land owned by the
18  trust.
19     Q.   This check was deposited into Umpqua Bank
20  in Portland?
21     A.   No.  Roseburg.  But it probably got
22  stamped through Portland.
23     Q.   Yeah.  And that's -- Hideaway Storage had
24  an account at Umpqua Bank?
25     A.   Yes.

80

1      Q.   As we go through these checks, let me know
2  if there's any of these checks where the signature
3  does not appear to be yours.  It's not your
4  signature, if you see any.
5      A.   You know, I would just have to dispute
6  that any of them are unless I saw the original
7  check.  But for the sake of this conversation, it
8  appears to be my signature.
9      Q.   Very similar to your signature?
10     A.   Very similar.
11     Q.   Do you have any reason to believe that
12  somebody would have been forging a check made out
13  for $4,000 to Hideaway Storage?
14     A.   I don't other than the Ann Green.
15     Q.   But Hideaway Storage is something that --
16     A.   I'm aware of.
17     Q.   You are involved.  And you don't know
18  somebody that would be forging a check --
19     A.   They shouldn't.  But for me to give you an
20  absolute exact, I would have to see the wet ink
21  signature.
22          Once again, I'm going to object because
23  what does this have to do with the causes of action
24  before your client?
25     Q.   I know.  I know.  We've got a difference

81

1  of opinion there.
2          David Shelton, who is he?
3      A.   What number are you on?
4      Q.   1098.
5      A.   You are way ahead of me, dude.  1098.
6  Chris Gulewich?
7      Q.   1098.
8      A.   Bates number?
9      Q.   I'm sorry.  You are looking --
10     A.   No, no.  You are way ahead of me.  Okay.
11  David Shelton.  I don't know.  Might have been doing
12  -- I don't know.  Doing maybe some carpentry work at
13  the storage or something.  David is just a handyman,
14  I think.
15     Q.   Then 1099, First USA.  Do you have a
16  credit card account with First USA?
17     A.   Probably.
18     Q.   1108, a check written out for $6,000 to
19  State Edition VISA.  Am I reading that right?
20     A.   That's what it looks like.
21     Q.   Did you have a State Edition VISA as well?
22     A.   I may have.  What's it say on the back of
23  the check?  FNBO.  There you go again.
24     Q.   You had an account with FNBO?
25     A.   May have.  That's were it was deposited.

| | 86 |
|---|---|
| 1 | just to help donate to the -- |
| 2 | Q.    Then 1226 is another check for 1500 made |
| 3 | out to Valynn Currie. |
| 4 | A.    Just reimbursing for whatever -- if she |
| 5 | put something out. |
| 6 | Q.    Did you rent anything from her or anything |
| 7 | like that? |
| 8 | A.    I don't think so.  I think if it was |
| 9 | rented it would have been paid out of the storage |
| 10 | account because they have to pay her rent for that |
| 11 | office at 265 Grant Smith Road.  She owns the |
| 12 | building so they rent the office. |
| 13 | Q.    How much is the rent on the office? |
| 14 | A.    500 a month.  When was this?  '08?  I |
| 15 | don't know. |
| 16 | Q.    Then 1234, a check written out to Lee |
| 17 | Sheldon.  Is that the same person as -- |
| 18 | A.    Leroy, yeah. |
| 19 | Q.    And, let's see, 1238 -- 1234 was a $5,000 |
| 20 | check and 1238 is a $10,000 check to Lee Sheldon? |
| 21 | A.    Yeah.  Lee Sheldon. |
| 22 | Q.    That's $15,000 together.  What would you |
| 23 | have been -- |
| 24 | A.    Probably working at one of the buildings, |
| 25 | adding building number nine or whatever it is. |

| | 87 |
|---|---|
| 1 | Doing work on that storage building. |
| 2 | Q.    A lot of work being done on that building? |
| 3 | A.    Yeah, between the two buildings.  Yeah. |
| 4 | He probably -- he supplied the materials and the |
| 5 | labor. |
| 6 | Q.    What type of work? |
| 7 | A.    Building a building. |
| 8 | Q.    The storage -- I thought the storage -- |
| 9 | you've had the storage facility for a long time. |
| 10 | A.    But when you add buildings -- |
| 11 | Q.    You added buildings at some point? |
| 12 | A.    Yes.  When it was purchased back in '91, |
| 13 | there was only like four buildings, three, yeah, |
| 14 | four from Mrs. McLaughlin.  And then you just add |
| 15 | buildings. |
| 16 | Q.    How many is there now? |
| 17 | A.    I think there's nine. |
| 18 | Q.    When was the last one added? |
| 19 | A.    A couple of years ago.  When was this? |
| 20 | '08?  That would be three years ago. |
| 21 | Q.    Is Hideaway Storage operating at a profit |
| 22 | now? |
| 23 | A.    No.  They've overbuilt in '07, '08 when |
| 24 | everybody was going like crazy.  They probably put |
| 25 | in another 3- or 400,000 square feet.  And it's the |

| | 88 |
|---|---|
| 1 | worst it's ever been since '91. |
| 2 | Poor old Roseburg, our unemployment rate is 24 |
| 3 | percent.  I mean -- |
| 4 | Q.    Brutal. |
| 5 | MR. KAYSER:  Why don't we take a break |
| 6 | now. |
| 7 | (Recess:  11:35 to 11:45 a.m.) |
| 8 | (Deposition Exhibit No. 8 |
| 9 | marked for identification.) |
| 10 | BY MR. KAYSER: |
| 11 | Q.    I'm going to show you what we've marked as |
| 12 | Deposition Exhibit No. 8. |
| 13 | A.    Okay. |
| 14 | Q.    This is Bates-numbered down at the bottom |
| 15 | 390 and runs through -- consecutively through 577. |
| 16 | And it's for a U.S. Bank account.  The account |
| 17 | number is listed up at the top as 4190040335963755. |
| 18 | And it's -- the account statement is addressed to |
| 19 | you, Larry J. Saccato, PO Box 143, Glide, Oregon. |
| 20 | Do you see all that? |
| 21 | A.    Yes, I do. |
| 22 | Q.    Can you confirm whether or not this |
| 23 | account was yours? |
| 24 | A.    Is the original application in here with |
| 25 | the wet ink signature? |

| | 89 |
|---|---|
| 1 | Q.    No. |
| 2 | A.    Then I can't.  It would appear -- it may |
| 3 | be. |
| 4 | Q.    So you can't deny it's yours. |
| 5 | A.    Can't deny and can't admit. |
| 6 | Q.    Go ahead and put that one aside. |
| 7 | (Off the record discussion.) |
| 8 | (Deposition Exhibit No. 9 |
| 9 | marked for identification.) |
| 10 | BY MR. KAYSER: |
| 11 | Q.    All right.  I'm going to show you what |
| 12 | we've marked as Deposition Exhibit No. 9, |
| 13 | Bates-numbered 578 through 685.  Do you see that? |
| 14 | A.    Yes. |
| 15 | Q.    And it's a U.S. Bank account statement for |
| 16 | account number 4037840006645319.  Do you see that? |
| 17 | A.    Yes. |
| 18 | Q.    And that's for Kendall Holdings.  Right? |
| 19 | A.    Yes.  Appears to be. |
| 20 | Q.    Kendall Holdings, as you testified |
| 21 | earlier, is the trust that held your residence at |
| 22 | 1355 Kendall Street? |
| 23 | A.    Correct. |
| 24 | Q.    This is addressed to Kendall Holdings at |
| 25 | that address, 1355 Kendall Street? |

120

```
1    State of Oregon    )
                        )        ss.
2    County of Lane     )

3

4        I, Eleanor G. Knapp, CSR-RPR, a Certified

5    Shorthand Reporter for the State of Oregon, certify

6    that the witness was sworn and the transcript is a

7    true record of the testimony given by the witness;

8    that at said time and place I reported all testimony

9    and other oral proceedings had in the foregoing

10   matter; that the foregoing transcript consisting of

11   119 pages contains a full, true and correct

12   transcript of said proceedings reported by me to the

13   best of my ability on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand and CSR

18   seal this 2nd day of August 2011 in the City of

19   Eugene, County of Lane, State of Oregon.

20

21

22

23

24   Eleanor G. Knapp, CSR-RPR

25   CSR No. 93-0262
```

| | |
|---|---|
| **From:** | Larry Saccato |
| **To:** | Chris Kayser |
| **Subject:** | Re: US Bank Case |
| **Date:** | Thursday, October 13, 2011 8:51:46 PM |

Chris,

Judge Hogans dismissal was not a major deterrent or unexpected, as I think that either his clerk made a mistake or he isn't clear on the new law regarding the consumers ability to directly dispute with the creditor. The Oregon Federal Judges have already admitted that they are not up to speed on FCRA and they have many other important issues to be dealing with. The Discover case it is similar to our case so naturally besides the motion to reconsider I plan on appealing the decision (same cost as refiling the action).

I think that his move to a Senior status statement on October 6th 2011 and the day he was made a senior was his birthday, may have had something to with his wanting to clear his calendar.

I plan to file my notice of appeal next week to preserve my appeal rights if he doesn't have time to rule on the motion to reconsider. (There may something more to the elevation to the movethe Judge to a senior position, might have to petition for a competence evaluation). I think that it would be a good learning curve to appeal his decision and pretty cool to have a pro se get it remanded to a "Senior" based on a 12 b6 dismissal. You must have read the 30 page amicus brief I referenced to in my MTR filed by the FTC and backed up by the Supreme's at http://www.nacaa.net/Saf-GeiAmicusFinal.pdf. Not trying to be difficult with the Judge and you, but right is right and wrong is wrong no matter how you want to twist it.

As to the production, maybe Lynne did not share the last e-mail with you regarding the items that we are still waiting for that was sent on September 20, 2011, before she went on vacation. There are a few. If you would like to stipulate and provide a certification that you have produced everything that your client has and that it is true, correct and complete I can proceed from there if you want. I just need to know your position on that.

What time would be good for you? AM if possible or Monday whatever fits.

Thanks

Larry Saccato

On Thu, Oct 13, 2011 at 12:18 PM, Chris Kayser <cjkayser@larkinsvacura.com> wrote:

> Larry,
>
> Thanks for the email. I take it that judge Hogan's dismissal of your other case, isn't changing your position on this one.
>
> In terms of deposition dates, the first week of November looks pretty good to me but I need to check with Stephanie. Are there any dates that don't work for you during that week?

In terms of documents, I am pretty confident that we produced them all.

As far as the schedule goes, I would like to keep the current schedule especially since I doubt the judge will grant us another one.

I am available to discuss tomorrow if you would like.

Regards,

Chris

---

**From:** Larry Saccato <ljsaccato@gmail.com>
**Date:** Thu, 13 Oct 2011 10:49:31 -0700
**To:** Lynne Sabatini<lynne@larkinsvacura.com>; Chris Kayser<cjkayser@larkinsvacura.com>; Chris Kayser<ckayser@larkinsvacura.com>
**Subject:** US Bank Case

Chris,

Just a note to see when you would be available to talk regarding the case. I know that you have been slammed but we have deadlines coming up in
early November and I am not sure we will get another extension of time or not.

We still have some production items that have not been produced and the need to agree on the dates for deposing Stephenie Buckley
and possibly one more person as soon as we get him or her identified by Stephanie.

I will be unavailable the week of October 21.

The call shouldn't take to long, just thought that we should discuss it so if we ask for
another extension we can say we have been working towards getting through the discovery.

Thanks

Larry Saccato

## CERTIFICATE OF SERVICE

I am over the age of 18 and am not a party to the within action. I am employed in Multnomah County, State of Oregon, and my business address is 621 SW Morrison St., Suite 1450, Portland, Oregon 97205.

On November 7, 2011, I served the following document(s):

**DECLARATION OF CHRISTOPHER J. KAYSER IN SUPPORT OF DEFENDANT U.S. BANK'S MOTION FOR SUMMARY JUDGMENT**

on the party or parties listed on the following page(s) in the following manner(s):

☐   **BY HAND DELIVERY:** For each party, I caused a copy of the document(s) to be placed in a sealed envelope and caused such envelope to be delivered by messenger to the street address(es) indicated on the attached service list.

☐   **BY FEDERAL EXPRESS:** For each party, I caused a copy of the document(s) to be placed in a sealed envelope and caused such envelope to be delivered by Federal Express to the street address(es) indicated on the attached service list.

☒   **BY FIRST-CLASS MAIL:** For each party, I caused a copy of the document(s) to be placed in a sealed envelope and caused such envelope to be deposited in the United States mail at Portland, Oregon, with first-class postage thereon fully prepaid and addressed to the street address(es) indicated on the attached service list.

☐   **BY FACSIMILE:** For each party, I caused a copy of the document(s) to be sent by facsimile to the facsimile number(s) indicated on the attached service list. If this action is pending in Oregon state court, then printed confirmation of receipt of the facsimile generated by the transmitting machine is attached hereto.

☐   **BY E-MAIL:** For each party, I caused a copy of the document(s) to be sent by electronic mail to the e-mail address(es) indicated on the attached service list. If this action is pending in Oregon state court, then I received confirmation that the e-mail was received.

☐   **BY ECF:** For each party, I caused a copy of the document(s) to be sent by electronic mail via ECF to the e-mail address(es) indicated on the attached service list.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct.

/s/Christopher J. Kayser
Christopher J. Kayser

Lawrence James Saccato
c/o 6387 Old Hwy 99 S
Roseburg Oregon 97470